KING, HOLMES, PATERNO & BERLINER, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
ROTHSCHILD@KHPBLAW.COM
1900 AVENUE OF THE STARS, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE:  (310) 282-8903

Attorneys for Plaintiff and Counter-
Defendant GLENN DANZIG

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| GLENN DANZIG, an individual,<br><br>              Plaintiff,<br><br>       vs.<br><br>GERALD CAIAFA, an individual;<br>CYCLOPIAN MUSIC, INC., a<br>corporation; and DOES 1 through 10,<br>inclusive,<br><br>              Defendants.<br>_____<br>AND RELATED COUNTERCLAIM. | CASE NO. CV14-02540 RGK-RZx<br>Hon. R. Gary Klausner, Courtroom 850<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF STEPHEN D. ROTHSCHILD IN OPPOSITION TO DEFENDANTS' *EX PARTE* APPLICATION FOR SANCTIONS**<br><br>Date:   None Set<br>Time:   None Set<br>Crtrm:  540<br><br>Action Filed:   April 3, 2014<br>Trial Date:     May 5, 2015<br><br>**DISCOVERY MATTER** |

Plaintiff and counter-defendant Glenn Danzig ("plaintiff") respectfully submits the following memorandum of points and authorities in opposition to the *ex parte* application of defendant Gerald Caiafa ("Caiafa") and defendant and counter-claimant Cyclopian Music, Inc. ("Cyclopian") (collectively, "defendants"), for monetary sanctions and for recommendation precluding testimony by plaintiff.

/ / /

/ / /

/ / /

3421.065/857116.2

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ............................................................................... 1

II.   STATEMENT OF FACTS ................................................................ 2

    A.    Factual Background ............................................................... 2

        1.    The Classic Misfits ................................................... 3

        2.    The 1995 Agreement ................................................ 3

        3.    Defendants' Fraud and Trade Libel ........................... 3

    B.    Procedural Background ........................................................... 4

    C.    The Parties' Settlement Discussions and Agreement to Defer
        Incurring Deposition and Motion Expenses ............................ 4

    D.    Defendants' Notice of Plaintiff's Deposition and Refusal
        Formally to Agree to Produce Caiafa and Cafiero for Their
        Depositions .......................................................................... 5

    E.    Prejudice to Plaintiff from Defendants' Gamesmanship ......................... 6

    F.    Defendants' Failure to Produce Any Relevant Documents .................... 7

III.  THE INSTANT MOTION VIOLATES LOCAL RULE 16-14 ...................... 7

IV.  THE INSTANT MOTION IS UNTIMELY BECAUSE
     DEFENDANTS MADE IT AFTER THE DISCOVERY CUTOFF ............... 7

V.   DEFENDANTS' APPLICATION FAILS TO DEMONSTRATE
     IRREPARABLE HARM AND DEFENDANTS ARE AT FAULT
     FOR CREATING THE ISSUES OF WHICH THEY COMPLAIN ............... 8

    A.    No Irreparable Prejudice to Defendants ................................... 8

    B.    Defendants, not Plaintiff, Are At Fault ................................... 9

    C.    Defendants Have Offered no Evidence to Support the Thousands
        of Dollars They Seek in Sanctions ........................................ 9

VI.  CONCLUSION ................................................................................ 10

1

## <u>TABLE OF AUTHORITIES</u>

2
<u>Page</u>

3

### <u>CASES</u>

4

*Clinton v. California Dept. of Corporations*,
 2009 WL 1308984 (E.D.Cal., 2009) ..................................................................8

*Davis v. Runnels*,
 2013 WL 1983308 *1 (E.D.CA 2013) ...........................................................7

*Gerawan Farming, Inc. v. Rehrig Pacific Co.*,
 2013 WL 492103*5  (E.D.Cal. 2013) ...........................................................7

*In re Sulfuric Acid*,
 231 F.R.D. 331, 333 (N.D.Ill.2005) .................................................................8

*Mission Power Engineering Co. v. Continental Cas. Co.*,
 83 F.Supp. 488, 492-493 (C.D.CA.1995) ....................................................8

*Watts v. Allstate Indem. Co.*,
 2012 WL 5289314 (E.D.Cal., 2012) ................................................................8

*Womack v. Metropolitan Transit System*,
 2010 WL 3911475 *2 (S.D.CA. 2010) ...........................................................7

### <u>RULES</u>

Federal Rules of Civil Procedure, Rule 16 .................................................................7

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Caiafa and the wholly owned entity through which he operates, Cyclopian, have manufactured the dispute upon which they base their instant procedurally defective, substantively meritless *ex parte* application to justify their refusal to produce witnesses and documents plaintiff needs to oppose the motion for summary judgment that defendants are filing on February 20, 2015.

The application is procedurally improper because:

(1)  It violates this Court's Local Rules by effectively asking a judicial officer other than the judicial officer who issued the scheduling order to extend the February 6, 2015 discovery cutoff;

(2)  Defendants brought it untimely after the discovery cutoff without first seeking an extension of the discovery cutoff;

(3)  It fails to present any evidence that defendants will suffer irreparable prejudice if their motion is heard on regular notice;

(4)  Defendants are at fault for creating the "emergency" they allege; and

(5)  Defendants have no pre-existing order that would justify evidence sanctions and no competent evidence that they incurred the expenses they claim or that such expenses were reasonable.

The application lacks substantive merit and is in bad faith because:

(1)  Counsel flew to Los Angeles on February 11, 2015, two days after plaintiff gave him express notice to him that plaintiff's deposition was not going to proceed on February 12, 2015 due to defendants' failure to (a) produce documents plaintiff needed to prepare for his deposition and (b) commit in writing that Caiafa and defendants' personal manager, John Cafiero ("Cafiero"), would attend their depositions in time for use in opposition to defendants' summary judgment motion;

(2)  Defendants now have reneged on their attorney's oral agreements to produce Caiafa and Cafiero for their depositions;

1   (3)  Defendants have refused to produce documents necessary for plaintiff to

2   prepare for his deposition and oppose defendants' motion for summary judgment,

3   and to meet and confer concerning that refusal; and

4   (4)  Defendants rejected a reasonable compromise whereby plaintiff offered

5   three alternative dates for his deposition, February 13, 16 and 17, 2015, on condition

6   that defendants comply with their obligations and agreements to produce documents

7   and produce Caiafa and Cafiero for their depositions for use in opposition to their

8   motion for summary judgment.

9   Defendants' conduct is particularly egregious because the subject of their

10   motion for summary judgment is whether there is evidence to support plaintiff's

11   claim that *they* misrepresented facts that disrupted plaintiff's economic relationship

12   with a third party.  Caiafa's and Cafiero's depositions, and defendants' documents,

13   are directly relevant to that subject.  Plaintiff's deposition is likely to be tangential.

14   For the Court's information, plaintiff also is preparing an *ex parte* application

15   to the Honorable R. Gary Klausner requesting an extension of the discovery and

16   motion cutoffs so that the parties may complete the discovery they agreed to prior to

17   briefing defendants' motion for summary judgment.  The evidence submitted in

18   support of the instant motion demonstrates that plaintiff has acted diligently and that

19   good cause exists for an extension.  That evidence includes the parties' extensive

20   settlement negotiations, the short time between when the instant action became at

21   issue at the discovery cutoff, and defendants' last-minute gamesmanship.

22   **II.   STATEMENT OF FACTS**

23   **A.   Factual Background**

24   This case is for interference with prospective business advantage.  The

25   gravamen of plaintiff's claim is that defendants fraudulently induced the largest

26   retailer of popular music-related merchandise in the United States, third party Hot

27   Topic, Inc. ("Hot Topic"), to refuse to do business with plaintiff.  Defendants' fraud

28   consisted of libelously misrepresenting to Hot Topic that defendants owned the

1   exclusive rights in a valuable design, originally known as the "Misfits Skull," and

2   that plaintiff has no rights in the design.  As a direct result of defendants'

3   misrepresentations, Hot Topic has refused to purchase Skull designs and

4   merchandise from plaintiff or his merchandisers.

5       In fact, plaintiff created the Misfits Skull and the parties agreed in a 1995

6   written settlement agreement (the "1995 Agreement") that they had equal rights to

7   exploit it.  [See Doc No. 15, Ex. 7, the 1995 Agreement.]

8               **1.    The Classic Misfits**

9       Plaintiff formed the classic "punk rock" band The Misfits in 1977.  Plaintiff

10  wrote all of The Misfits' songs, designed all of its artwork and logos, and was its

11  lead singer.  After plaintiff formed The Misfits, Caiafa replaced another member.

12      The Misfits disbanded in 1983.  Plaintiff continued to have a successful career

13  as a recording artist, composer and performer, while Caiafa did not.

14              **2.    The 1995 Agreement**

15      Motivated by renewed interest in The Misfits to which plaintiff's success

16  substantially contributed, Caiafa sued plaintiff in 1993, *inter alia*, to obtain an

17  interest in the band's logos and artwork.  The parties entered into the 1995

18  Agreement pursuant to which they expressly agreed that "[t]he parties shall be co-

19  owners of the name and trademark of the Misfits and all logo(s) and artwork …

20  previously associated therewith."  [Doc No. 15, Ex. 7.]  That included the Skull,

21  which The Misfits used as a stage backdrop, on album covers, and on merchandise.

22              **3.    Defendants' Fraud and Trade Libel**

23      In 2003, defendants falsely represented to Hot Topic that defendants owned

24  the exclusive rights to plaintiff's Skull design.  Based on that fraudulent

25  representation, Hot Topic entered into an agreement that it would purchase Skull

26  designs and merchandise only from defendants.  Defendants have continued to libel

27  plaintiff by falsely re-asserting to Hot Topic that plaintiff has no rights in the Skull

28  design.  Hot Topic has refused to buy Skull designs and merchandise from plaintiff

1  or his merchandisers in order to avoid the risk of reprisal from defendants.  As a

2  result, plaintiff has suffered and continues to suffer hundreds of thousands of dollars

3  in damages each year from lost sales to Hot Topic.

4  **B.**     **Procedural Background**

5         Plaintiff filed the instant action on April 3, 2014.  [Doc. 1.]  Plaintiff served

6  defendants by notice and acknowledgement of receipt.  [Docs. 6, 7.]  Defendants

7  filed motions to dismiss the complaint on June 20, 2014 for failure to state a claim

8  and for lack of personal jurisdiction.  [Docs. 11, 14.]  On August 6, 2014, the Court

9  denied defendants' motion to dismiss on jurisdictional grounds, and granted

10 defendants' motion to dismiss for failure to state a claim, with leave to amend.

11 [Doc. 40.]  Plaintiff filed his first amended complaint ("FAC") on August 15, 2014.

12 [Doc. 41.]  The Court held the scheduling conference on September 8, 2014 and set

13 a February 6, 2015 discovery cutoff that gave the parties less than five months to

14 conduct discovery, a February 20, 2015 motion cutoff, an April 20, 2015 Pretrial

15 Conference, and a May 5, 2015 trial date.  [Doc. 49.]

16        Defendants filed a motion to dismiss the FAC on September 11, 2014.

17 [Doc. 44.]  On November 18, 2015, the Court granted in part and denied in part

18 defendants' motion to dismiss the FAC.  [Doc. 59.]  Defendants filed a counterclaim

19 on December 2, 2015, which the Court struck, and a procedurally proper

20 counterclaim on December 12, 2014, less than two months before the discovery

21 cutoff.  The action was at issue on January 6, 2015, when plaintiff filed his answer

22 to the counterclaim one month before the discovery cutoff.  [Docs. 60, 62, 64, 65.]

23 **C.**     **The Parties' Settlement Discussions and Agreement to Defer**
          **Incurring Deposition and Motion Expenses**

24

25        The parties engaged in intensive settlement discussions from mid-December

26 2014 to February 10, 2014, interrupted only by the holidays and a pre-paid family

27 vacation of plaintiff's counsel from January 16, 2015 to January 23, 2015.  The

28 discussions included many calls between counsel, lengthy email exchanges, draft

1  agreements, and consultations with clients and their other representatives.

2  (Declaration of Stephen D. Rothschild ("Rothschild Decl."), ¶¶ 5-31 and Exs. 1-13.)

3         Defendants' counsel threatened to derail settlement discussions if the parties

4  had to incur deposition expenses and if defendants incurred expenses preparing a

5  motion for summary judgment.  (*Id.*, ¶ 42.)  Therefore, the parties agreed to delay

6  depositions pending completion of settlement discussions.  (*Id.*, ¶ 44 and Ex. 21.)

7  The decision was not, as defendants falsely assert, the result of a "ultimatum" by

8  plaintiff.  (Compare declaration of Curtis Krasik, ¶ 6 and, e.g., Rothschild Decl.,

9  ¶ 44 and Ex. 21, February 4, 2015 email exchange memorializing *mutual* agreement

10  to defer depositions due to settlement negotiations.)  Indeed, *defendants' counsel*

11  refused to produce Cafiero until February 9, 2015, and Caiafa and Caiafa until

12  February 10, 2015.  (*Id.*, Ex. 20.)

13     **D.    Defendants' Notice of Plaintiff's Deposition and Refusal Formally
              to Agree to Produce Caiafa and Cafiero for Their Depositions**

14

15         On Friday, February 6, 2015, the discovery cutoff, defendants unilaterally

16  served notice of plaintiff's deposition for February 12, 2015.  Plaintiff became

17  concerned because defendants had not cleared the date with plaintiff or produced

18  documents needed to prepare for his deposition and to oppose defendants' motion

19  for summary judgment.  Therefore, on Monday, February 9, 2015, plaintiff's

20  counsel told defendants' counsel orally that plaintiff could not adequately prepare

21  for a deposition on February 12.  (*Id.*, ¶¶ 49.)

22         In addition, after researching the enforceability of post-discovery cutoff

23  discovery, on February 9, 10 and 11, 2015, plaintiff's counsel repeatedly told

24  defendants' counsel orally and in writing that the parties needed a mechanism to

25  ensure defendants' compliance with their attorney's informal representations that

26  Caiafa and Cafiero would appear for their depositions before defendants filed their

27  motion for summary judgment.  Cafiero's deposition was essential because he is the

28  person through whom defendants continue to misrepresent to Hot Topic that

plaintiff has no rights in the Misfits Skull.  Plaintiff asked defendants to enter into a stipulation that, if Caiafa and Cafiero reneged on defendants' attorney's agreement, defendants would not proffer Caiafa's and Cafiero's testimony in support of their motion for summary judgment.  (*Id.*, ¶¶ 46-49.)

Defendants' counsel refused to stipulate to any consequences if Caiafa and Cafiero did not appear for their depositions.  (*Id.*, ¶ 50.)

After notice that plaintiff could not prepare for a February 12 deposition and refusing to commit to producing Caiafa and Cafiero for their depositions in time for plaintiff to offer their testimony in opposition to defendants' motion for summary judgment, defendants counsel incurred the expenses of traveling to Los Angeles and retaining a court reporter.  Defendants' counsel had full knowledge plaintiff's deposition was not going to proceed on February 12.  (*Id.*, ¶¶ 49-56, Exs. 13, 22.)

Plaintiff has told defendants that he continues to be ready, willing and able to sit for his deposition.  Plaintiff offered to appear on February 13, 16 or 17, if defendants produce relevant documents and Caiafa and Cafiero commit to appear for their depositions before they file their motion for summary judgment. Defendants refused to entertain any compromise.  Instead, they have used the instant discovery dispute as an excuse to refuse to produce Caiafa, Cafiero, and defendants' documents.  (*Id.*, ¶¶ 54, 57, Ex. 22.)

## E.  Prejudice to Plaintiff from Defendants' Gamesmanship

Defendants' gamesmanship is particularly egregious in view of the nature of their planned motion for summary judgment.  The motion will seek to establish that *defendants* did nothing to interfere with plaintiff's ability to do business with the largest United States retailer of merchandise associated with popular music, Hot Topic.  (*Id.*, Ex. 24.)  Information relevant to that issue is in the possession of defendants themselves and Hot Topic.  Plaintiff himself is not a percipient witness to defendants' trade libel and fraud.

/ / /

**F.**   **Defendants' Failure to Produce Any Relevant Documents**

On February 11, 2015, defendants purported to produce 345 pages of documents in response to plaintiff's requests for production.  The production consisted almost entirely of documents that plaintiff had produced to defendants in proceedings before the Trademark Trial and Appeals Board or that defendants filed publically with the Patent and Trademark Office.  Defendants have refused to meet and confer concerning the deficiencies in their document production and responses to plaintiff's requests for production.  (Rothschild Decl., ¶¶ 60-65, Ex. 23.)

**III.**   **THE INSTANT MOTION VIOLATES LOCAL RULE 16-14**

Local Rule 16-14 provides as follows:

> L.R. 16-14 Modification of Scheduling Orders and Pretrial Orders. Any application to modify an order entered pursuant to F.R.Civ.P. 16 shall be made to the judicial officer who entered the order.

The Honorable R. Gary Klausner was the judicial officer who issued the scheduling order herein.  [Doc. 49.]  The scheduling order set the discovery cutoff on February 6, 2015.  The instant application seeks sanctions because plaintiff did not appear for a deposition on February 12, 2015, six days after the discovery cutoff. Defendants have not sought an extension of the discovery cutoff.

Defendants may not seek to enforce post-cutoff discovery without an extension of the discovery cutoff from Judge Klausner, which they do not have.  See *Davis v. Runnels*, 2013 WL 1983308 *1 (E.D.CA 2013) (post-discovery cutoff discovery unenforceable without extension of discovery cutoff); *Womack v. Metropolitan Transit System*, 2010 WL 3911475 *2 (S.D.CA. 2010).

**IV.**   **THE INSTANT MOTION IS UNTIMELY BECAUSE DEFENDANTS MADE IT AFTER THE DISCOVERY CUTOFF**

Absent an extension of the discovery cutoff, courts generally deny discovery motions filed after the discovery cutoff as untimely.  The Court in *Gerawan Farming, Inc. v. Rehrig Pacific Co.*, 2013 WL 492103*5 (E.D.Cal. 2013) reviewed

the applicable rules, as follows:

> Though the Federal Rules of Civil Procedure place no time limit on the outside date for the filing of a motion to compel discovery, motions to compel filed after the close of discovery generally are deemed untimely. See, e.g., *Watts v. Allstate Indem. Co.*, 2012 WL 5289314 (E.D.Cal., 2012); *Clinton v. California Dept. of Corporations*, 2009 WL 1308984 (E.D.Cal., 2009). "Greater uncertainty occurs where the motion is made very close to the discovery cut-off date." *In re Sulfuric Acid*, 231 F.R.D. 331, 333 (N.D.Ill.2005). Generally, "the matter is left to the broad discretion possessed by the district courts to control discovery." *Id.*

In the case at bar, defendants have failed to seek or obtain an extension of the discovery cutoff.  Indeed, defendants' counsel rejected plaintiff's suggestion that the parties stipulate to an order extending the discovery cutoff for a short period, stating that they did not want to harm their reputation with the Court.

## V.   DEFENDANTS' APPLICATION FAILS TO DEMONSTRATE IRREPARABLE HARM AND DEFENDANTS ARE AT FAULT FOR CREATING THE ISSUES OF WHICH THEY COMPLAIN

The court in *Mission Power Engineering Co. v. Continental Cas. Co.*, 883 F.Supp. 488, 492-493 (C.D.CA.1995) explained the standards for *ex parte* relief, as follows:

> What showing is necessary to justify ex parte relief? First, the evidence must show that the moving party's cause will be irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures. Second, it must be established that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect.

> To show irreparable prejudice, it will usually be necessary to refer to the merits of the accompanying proposed motion, because if it is meritless, failure to hear it cannot be prejudicial. A sliding scale is used to measure the threat of prejudice. If the threatened prejudice would not be severe, then it must be apparent that the underlying motion has a high likelihood of success on the merits. If drastic harm is threatened, then it is sufficient to show that there are close issues that justify the court's review before the party suffers the harm.  [Footnote omitted.]

### A.   No Irreparable Prejudice to Defendants

King, Holmes, Paterno & Berliner, LLP

1    Defendants have failed even to purport to show irreparable prejudice.

2   Plaintiff is not a percipient witness to defendants' wrongdoing.  His testimony is

3   unlikely to have a significant effect on the result of defendants' summary judgment

4   motion.  In contrast, by creating this dispute defendants threaten to cause plaintiff

5   irreparable prejudice.  Defendants now refuse to produce Caiafa or Cafiero for their

6   depositions and defendants now refuse to produce documents needed to address

7   their motion for summary judgment.  Since it is defendants' conduct that is directly

8   at issue, by reneging on their deposition agreements and withholding documents

9   defendants are attempting to deny plaintiff evidence relevant to their motion.

10       **B.**     **Defendants, not Plaintiff, Are At Fault**

11       On February 10 and 11, 2015, defendants had oral and written notice that

12   plaintiff was not prepared to appear for his deposition on February 12, 2015.  (*Id.*, ¶¶

13   49-56, Exs. 13 and 22.)

14       Moreover, defendants are at fault for the matters of which they complain.

15   Had defendants timely produced documents and agreed not to use Caiafa's and

16   Cafiero's testimony to support their motion for summary judgment in the event that

17   they failed to comply with their attorney's representations that they would appear

18   for their depositions, there would have been no dispute.

19       Defendants also have refused to cooperate in attempting to resolve this

20   dispute.  Plaintiff offered to appear for his deposition on February 13, 16, 17 on

21   condition that defendants make a meaningful document production and follow

22   through on their agreements to be deposed and to produce Mr. Cafiero for his

23   deposition.  Defendants have refused to entertain any effort to compromise.

24   Moreover, defendants have advised plaintiff that they intend to oppose a short

25   extension of the discovery and motion cutoffs so the parties can complete discovery

26   before litigating defendants' summary judgment motion.

27       **C.**     **Defendants Have Offered no Evidence to Support the Thousands of Dollars They Seek in Sanctions**

28

KING, HOLMES,
PATERNO &
BERLINER, LLP

1    Defendants also have failed to provide any evidence to support their sanctions

2  award.  For example, they have offered no time records, receipts, or evidence that

3  their exorbitant hourly rates are reasonable or their usual and customary rates,

4  including their $550 rate for associates.  Defendants have not even submitted a

5  receipt for their attorney's airfare.  Nor do defendants have any order for plaintiff's

6  deposition.

7  **VI.**   **CONCLUSION**

8    For each of the foregoing reasons, plaintiff respectfully requests that this

9  Court deny the instant motion, in its entirety and, if it is in a position to do so,

10  extend the discovery and motion cutoffs and order the parties to complete discovery

11  before defendants file their motion for summary judgment.

12

13  DATED:  February 17, 2015          KING, HOLMES, PATERNO &
                                        BERLINER, LLP
14

15

16                                     By:      /s/ Stephen D. Rothschild
17                                            HOWARD E. KING
18                                            STEPHEN D. ROTHSCHILD
                                        Attorneys for Plaintiff and Counter-Defendant
19                                        GLENN DANZIG

20

21

22

23

24

25

26

27

28

## DECLARATION OF STEPHEN D. ROTHSCHILD

I, Stephen D. Rothschild, declare:

1.     I am a member of the State Bar of California admitted to practice before this Court, and am a partner of King, Holmes, Paterno & Berliner, LLP, attorneys for plaintiff and counter-claimant Glenn Danzig ("plaintiff") herein.  I have personal knowledge of the matters below and could and would testify competently to them if asked.

2.     I make this declaration in support of plaintiff's opposition to the *ex parte* application of defendant Gerald Caiafa ("Caiafa") and defendant and counter-claimant Cyclopian Music, Inc. (collectively, "defendants"), for monetary sanctions and for recommendation precluding testimony by plaintiff.

3.     The parties' settlement discussions and prior discovery are relevant to the events that defendants' mischaracterize in their instant application.  In addition, plaintiff intends to seek an order extending the discovery and motion cutoffs, and those events will be relevant to that request.  In order to provide this Court with the relevant background, and for use in the event that this Court is in a position to consider plaintiff's application to extend the discovery and motion cutoffs, this declaration describes those events in sections A, B and C below, as well as the events immediately leading to the instant dispute in sections D, E and F below.

4.     I believe that the parties can complete discovery by March 15, 2015.

A.     **The Parties' Extensive Settlement Discussions and Their Agreement to Defer Depositions**

5.     The parties spent a great deal of time on settlement discussions between early December and February 9, 2015, when settlement discussions broke down. Until February 9, I believed that the both sides were anxious to reach a fair and reasonable settlement.  In fact, the parties went so far as to discuss terms by which they not only would share ownership of the designs at issue in this lawsuit, but also participate in a Misfits reunion tour.  The parties had not performed together since

1983.

6.     I first discussed settlement at length with defendants' counsel, Curt Krasik, during a telephone conversation on December 8, 2014.

7.     Attached hereto as **Exhibit 1** is a true and correct copy of an email I sent to Mr. Krasik on December 15, 2014 with a settlement offer that I prepared after a review of prior settlement negotiations between the parties and consultation with my client and partners who regularly practice transactional music law.

8.     Attached hereto as **Exhibit 2** is a true and correct copy of a December 18, 2014 email I received Mr. Krasik, with a response to plaintiff's December 15, 2014 settlement offer.

9.     Mr. Krasik and I had another lengthy settlement discussion on December 19, 2014.

10.     On December 22, 2014, I sent Mr. Krasik the email, a true and correct copy of which is attached hereto as **Exhibit 3**, responding in detail to his December 19, 2014 proposal.

11.     I returned to my office after the holidays on Monday, January 5, 2015, and Mr. Krasik and I resumed our settlement efforts.

12.     On January 8, 2015, Mr. Krasik proposed a conference call with him, defendants' manager John Cafiero ("Cafiero"), and me to discuss settlement, for January 9, 2015.  Mr. Krasik then advised me that Cafiero had to reschedule the call to January 12, 2014.

13.     On January 12, 2015, Mr. Krasik, Mr. Cafiero, myself, and one of plaintiff's transactional attorneys, Joe Carlone, participated in the conference call. Mr. Cafiero made a proposal, but was unable to respond to my questions about it.

14.     On January 13, 2015, Mr. Krasik sent me the email, a true and correct copy of which appears at the end of the January 13-14, 2015 email chain attached hereto as **Exhibit 4**, clarifying Mr. Cafiero's proposal.

15.     From January until 16 to January 25, 2015 I was out of my office for an

1   educational trip to Cuba that had been planned and paid for in Spring 2014.  I did

2   not have regular access to email while I was in Cuba.

3   16.   When I returned to my office on January 26, 2015, I gave Mr. Krasik

4   plaintiff's response to his January 13, 2015 proposal by phone.  Attached hereto as

5   **Exhibit 5** is a true and correct copy of a January 15 to January 26, 2015 email chain

6   that includes my January 26, 2015 email to Mr. Krasik confirming our conversation

7   of that date in which I had given him plaintiff's response to defendants' January 13,

8   2015 proposal.

9   17.   Mr. Krasik and I engaged in another lengthy settlement discussion on

10  January 29, 2015.  During that discussion, Mr. Krasik took the position that plaintiff

11  could not prove that the Misfits Skull was associated with the Misfits before the

12  parties' 1995 settlement agreement wherein they agreed to co-own existing Misfits

13  logos.  Attached hereto as **Exhibit 6** is a true and correct copy of a January 29, 2015

14  email I sent Mr. Krasik following that conversation, in which I advised him that

15  there are a multitude of pre-1984 photographs and videos of the Misfits with the

16  Skull logo, including a 1983 video an entire Misfits concert with the Skull as a

17  backdrop, a link to which I included in the email.

18  18.   Attached hereto as **Exhibit 7** is a true and correct copy of a Friday,

19  January 30, 2015 email chain with another lengthy settlement proposal from Mr.

20  Krasik and a response to the substantive arguments he made.

21  19.   During a Monday, February 2, 2015, telephone call, I told Mr. Krasik

22  that I was formulating a response to the new settlement proposal he had sent the

23  previous Friday.  We also discussed various terms.

24  20.   For example, defendants were highly desirous of doing a reunion tour

25  with plaintiff.  While defendants' "new Misfits" attract a small following primarily

26  by playing covers of the Misfits songs that plaintiff wrote, plaintiff has a successful

27  career with a significant North American and international fan base.  Defendants

28  believed that, by riding on plaintiff's coattails, they would earn much more with a

1  handful of concerts that they earned in years of touring as an original Misfits cover

2  band.  As part of their proposed settlement, the plaintiff was willing to participate in

3  a few reunion concerts, but not the grand tour that defendants wanted and needed.

4      21.    On February 3, 2015, Mr. Krasik and I exchanged more emails on

5  settlement and a draft short form agreement, true and correct copies of which are

6  attached hereto as **Exhibit 8**.

7      22.    On February 4, 2015, Mr. Krasik and I continued to discuss settlement.

8  I proposed that the parties participate in a mediation if the ongoing discussions did

9  not result in a settlement that week.  I suggested a respected mediator familiar with

10  entertainment industry disputes, the Honorable Michael Latin (Ret.).  A true and

11  correct copy of my February 4, 2015 email to Mr. Krasik suggesting mediation is

12  attached hereto as **Exhibit 9**.  After my conversation with Mr. Krasik, I telephoned

13  Judge Latin's assistant and was told that, due to some a cancellation, he was

14  available the following week.  I relayed that information to Mr. Krasik.

15      23.    On Monday, February 9, 2015, I emailed Mr. Krasik plaintiff's

16  counterproposal, a true and correct copy of which is attached hereto as **Exhibit 10**.

17      24.    On February 10, 2015, I received an email from Mr. Krasik containing

18  a significantly different counterproposal in the form of a drastically altered redline

19  of my prior proposal, a true and correct copy of which is attached hereto as

20  **Exhibit 11**.

21      25.    Attached hereto as **Exhibit 12** is a February 10, 2015 email chain in

22  which I sought clarification of defendants' February 10, 2015 counterproposal.

23  **B.**     **Settlement Negotiations Break Down as a Result of Defendants' Failure to Negotiate in Good Faith**

24

25      26.    After thoroughly reviewing defendants' February 10, 2015 proposal

26  and Mr. Krasik's clarification of various ambiguities in it, I concluded that

27  defendants' position was too unreasonable to result in a settlement.

28      27.    The parties' 1995 Settlement Agreement unambiguously provided that

1   each party would co-own the Misfits Skull logo.

2      28.   Defendants' own evidence, along with later communications from

3   Cafiero, evidence that defendants had fraudulently induced Hot Topic to grant

4   Caiafa a perpetual exclusive right to sell Skull designs and merchandise to Hot

5   Topic.  Specifically, Cafiero and defendants had falsely stated to Hot Topic, in

6   writing and orally, that they owned all rights to the Skull, to the exclusion of

7   plaintiff.  Those statements were fraudulent as to Hot Topic and constituted trade

8   libel as to plaintiff.

9      29.   Yet, defendants' settlement position yielded to plaintiff none of the

10  rights for which the parties had bargained in their 1995 settlement agreement and

11  gave defendants benefits far in excess of what they had bargained for.

12     30.   Under defendants' proposed agreement, plaintiff could have sold Skull

13  designs for two or three years.   Defendants would have received the following:

- One-half of plaintiff's revenues from his use of the Skull design for no more than three years (the "Term"), after which plaintiff would no longer be able to exploit the Skull without defendants' consent not only through sales to Hot Topic, but also through sales to other retailers to which defendants had never before objected;

- Defendants would have the unfettered right to stop plaintiff from exploiting his Skull design after the Term;

- Plaintiff would have to participate in a Misfits reunion tour with Caiafa and give Caiafa one-half of the profits therefrom, even though the success of such a reunion was dependent on plaintiff's participation, and not on Caiafa's; and

- Plaintiff would have to grant licenses to Caiafa on favorable terms to record original Misfits songs, all of which plaintiff wrote and none of which Caiafa wrote.

31.   I stated the foregoing to Mr. Krasik in a February 11, 2015 email, a true and correct copy of which is attached hereto as **Exhibit 13**.

**C.    Discovery Conducted to Date**

32.   The parties exchanged initial disclosures on September 19, 2014.

33.     Defendants served first sets of interrogatories and requests for production on December 22, 2014, to which plaintiff responded on January 28, 2015.

34.     Plaintiff served requests for production on December 31, 2014, to which defendants served objections and responses on February 2, 2015.  A true and correct copy of defendants' "responses and objections" to plaintiff's requests for production is attached hereto as **Exhibit 14**.

35.     Defendants served notice of plaintiff's deposition for February 4, 2015 on January 14, 2015.

36.     Plaintiff served the notice of defendant Caiafa's deposition for 9:00 a.m. on February 2, 2015 on January 15, 2015, a true and correct copy of which is attached hereto as **Exhibit 15** by e-mail and U.S. Mail, giving Mr. Caiafa eighteen days' notice.  The location of the deposition was New Jersey, where Caiafa resides.

37.     *Eight days* after plaintiff emailed his January 15, 2015 notice of defendants' deposition, on January 23, 2015, Mr. Krasik advised me by email for the first time that Mr. Caiafa would not start his deposition until noon on February 2, 2015.  A true and correct copy of the email chain including Mr. Krasik's January 23, 2015 email is attached hereto as **Exhibit 16**.

38.     On January 26, 2015, I spoke to Mr. Krasik about settlement and Mr. Caiafa's deposition, and the deposition schedule in general.  Among other things, I told Mr. Krasik that unilaterally changing the start of Mr. Caiafa's deposition from 9:00 a.m. to noon was unworkable because it would require me to spend an extra day on the East Coast, thereby increasing the cost of the deposition to plaintiff substantially.  Mr. Krasik unapologetically refused to comply with the 9:00 a.m. start time.  As a compromise I asked Mr. Krasik to provide an alternative date for Mr. Caiafa's deposition.

39.     Plaintiff served the notice of the deposition of third party Hot Topic, Inc. for January 30, 2015 on January 15, 2015, a true and correct copy of which is

1   attached hereto as **Exhibit 17**.

2   40.   On January 26, 2015, I sent Mr. Krasik the email, a true and correct

3   copy of which is attached hereto as **Exhibit 18**, stating that plaintiff would be

4   available for his deposition February 4 (the date that Mr. Krasik had noticed), 5 or 6.

5   41.   Plaintiff served the notice of the deposition of defendants' manager,

6   John Cafiero, for February 6, 2015 on January 27, 2015, a true and correct copy of

7   which is attached hereto as **Exhibit 19**.

8   42.   In a January 28, 2015 email, a true and correct copy of which is

9   contained in the January 26 to January 28, 2015 email chain attached hereto as

10   Exhibit 20 Mr. Krasik notified me that Cafiero would not be available for his

11   deposition until February 9, 2015, three days *after* the discovery cutoff, and that he

12   would not make defendant Caiafa available for his deposition until February 10,

13   2015, four days *after* the discovery cutoff.  However, at or about that time,

14   Mr. Krasik also told me that, if the parties had to incur the expense of taking

15   depositions and litigating defendants' motion for summary judgment, the likelihood

16   of settlement would be substantially reduced.  I agreed with him.

17   43.   In his January 28, 2015 email that is part of **Exhibit 20**, Mr. Krasik

18   also refused to enter into a stipulation and proposed order to extend the discovery

19   and motion cutoffs for a short period of 30 days to accommodate the post-discovery

20   cutoff dates he proposed and our continuing settlement discussions.  Mr. Krasik told

21   me several times that he would not enter into such a stipulation because he was

22   concerned it would damage the his reputation with the Court, although he agreed

23   that an extension was in the parties' best interests and in the interest of judicial

24   economy to accommodate settlement discussions.

25   44.   On February 4, 2015, Mr. Krasik agreed that Caiafa and Cafiero would

26   sit for their depositions the week of February 16, 2015, and I agreed that plaintiff

27   would sit for his deposition Tuesday, Wednesday or Thursday the week of

28   February 9, 2015.  I also agreed to make third party Felix Sebacious, and executive

1   at plaintiff's merchandiser Live Nation Merchandise, available for his deposition.

2   Plaintiff is located in California, and Caiafa, Cafiero and Mr. Sebacious are located

3   in New Jersey and New York.  A true and correct copy of the February 4, 2015

4   exchange between Mr. Krasik and me confirming that agreement is attached hereto

5   as **Exhibit 21**.

6       45.    Plaintiff served his designation of non-retained expert witness on

7   February 5, 2015.

8   **D.**    **Mr. Krasik's Decision to Travel to Los Angeles after He Was On Notice**

      **that Plaintiff Would Not Be Prepared to Appear for His Deposition on**

9         **February 12, and Defendants' Refusal to Stipulate to Appear for Their**

      **Post-Discovery Cutoff Depositions**

10

11       46.    On February 6, 2015, without speaking to me before picking a specific

12   date for plaintiff's deposition, defendants served an amended notice of plaintiff's

13   deposition for February 12, 2015 on Friday, February 6, 2015.

14       47.    When I received the February 6, 2015 amended notice of plaintiff's

15   deposition, I became concerned whether, since the parties had informally agreed to

16   schedule Caiafa's and Cafiero's depositions, plaintiff would have a remedy if Caiafa

17   and Cafiero did not appear for their depositions before defendants filed their motion

18   for summary judgment, as Mr. Krasik had told defendants intended to do before the

19   February 20, 2015 discovery cutoff.

20       48.    After researching the enforceability of post-discovery cutoff discovery

21   I realized that plaintiff needed a mechanism to ensure that he obtained Caiafa's and

22   Cafiero's depositions in time for use in opposition to defendants' motion for

23   summary judgment.  I also was concerned because defendants had failed to produce

24   any of the documents they had agreed to produce in response to plaintiff's requests

25   for production.

26       49.    Therefore, on February 9, 2015, I told Mr. Krasik that plaintiff could

27   not be prepared for his deposition by February 12, 2015 because we had no

28   documents from defendants, and that I would need a written stipulation from

1  defendants that, if Caiafa and Cafiero did not appear for their depositions as agreed,

2  defendants would not use any testimony from them in support of the motion.

3      50.    Mr. Krasik told me had "no idea what I was talking about" and that I

4  could rely on his "word."  I told him that I trusted him, but had no ability to assure

5  that Caiafa and Cafiero would follow his advice.  I also was concerned that

6  Mr. Krasik was not being forthright when he said he did not understand my

7  concerns.

8      51.    Mr. Krasik has told me many times that his associate, Christina

9  Goodrich, clerked for Judge Klausner and that Mr. Krasik and she were concerned

10  that, if they stipulated to continue the discovery cutoff herein to accommodate our

11  settlement discussions, it would harm their personal relationship with the Court.

12      52.    Ms. Goodrich's firm's website reflects her experience as a clerk for two

13  United States District Court judges (Judge Klausner and the Honorable Otis D.

14  Wright II) and one Appellate Court judge (the Honorable Arthur L. Alarcon).  I

15  suspected that, based on Ms. Goodrich's extensive federal court experience,

16  Mr. Krasik knew the rules on enforcement of post-cutoff discovery and understood

17  exactly why a mechanism to guaranty Caiafa's and Cafiero's appearances at their

18  depositions was necessary.

19      53.    In my February 10, 2015 email to Mr. Krasik attached hereto as Exhibit

20  13, I reiterated the need for a mechanism to assure that Caiafa and Cafiero appeared

21  for their depositions before defendants filed their motion for summary judgment,

22  and again made it clear that plaintiff would not be appearing for his deposition on

23  February 12, as follows:

> At this point, we have not met and conferred concerning deficiencies in your responses to our requests for production, your client has produced no documents, there is no protective order in place, and *we have no enforceable assurances that, if we produce our client for deposition, you will produce Messrs. Caiafa and Cafiero for their depositions in time to use their testimony to oppose your threatened motion for summary judgment (or at all).  In addition, without the documents we*

*requested, we will not have a full and fair opportunity to question your client and his manager.*

*Let's talk tomorrow realistically about how to proceed now that it appears that we are going to try this case.*

(Emphasis added.)

54. On February 11, 2015, I offered to make plaintiff available for deposition on February 13, 16 or 17, 2015, on condition that defendant produce the documents plaintiff and requested and that defendants no use Caiafa's or Cafiero's testimony in connection with defendants' motion for summary judgment if they did not appear for their depositions prior to the filing of the motion.  Although Mr. Krasik had told me he was unavailable on February 13, two other attorneys at Mr. Krasik's firm who have been assigned to this case since its inception, Ms. Goodrich and Seth Gold, are located in Los Angeles and could have taken the deposition.

55. Attached hereto as **Exhibit 22** is a true and correct copy of my February 11, 2015 letter to Mr. Krasik again confirming that plaintiff could not appear for his deposition on February 12, and explaining my concerns, along with the cover email transmitting it.

56. Although Mr. Krasik served notice of plaintiff's deposition on February 6, 2015 and he and I discussed his notice of deposition before he flew to Los Angeles, *at no time did Mr. Krasik directly ask me whether plaintiff was going to appear for his deposition on February 12, 2015*, as any competent and cautious attorney would have done before traveling across country.  I believe Mr. Krasik intentionally avoided creating a direct record on the issue in order to prevent a compromise that would have required defendants to produce documents and Caiafa and Cafiero to appear for their depositions.

57. I also spoke to Mr. Krasik several times by telephone on February 11, 2015.  I told him that in addition to February 13, 2015, plaintiff also could be available for his deposition February 16 or 17, 2015, or any other day the week of

1   February 16.  He refused to consider those dates.  I also asked him if Caiafa and

2   Cafiero were going to appear for their depositions the following week.  He said no.

3         58.    Mr. Krasik claims at paragraph 6 of his declaration in support of the

4   instant application that I refused to produce plaintiff for his deposition on

5   February 4, 2015.  In fact, Mr. Krasik and I *agreed* to continue that and his clients'

6   depositions so that we could continue to discuss settlement.  ***Indeed, Mr. Krasik told***

7   ***me that, if the parties had to incur the expense of conducting depositions and***

8   ***litigating a summary judgment motion, settlement would become substantially less***

9   ***likely***.  In my February 4, 2015 email to Mr. Krasik attached hereto as **Exhibit 21**, I

10   confirmed our agreement to defer depositions, as follows:

11   Curt:

12           This shall confirm our discussion today about deposition
13           scheduling.   Because we have been spending so much
              time last week and this week on fruitful settlement
14           discussions which are still continuing, ***we agreed to defer***
              ***the depositions we had noticed of Messrs. Caiafa,***
15           ***Cafiero, Danzig and Sebacious***.  Today, we agreed that, if
              the parties do not reach a settlement before then, I will
16           make Mr. Danzig available for his deposition next week,
              and you will make Mr. Caiafa and Mr. Cafiero available
17           for their depositions next week or the week of February
              16.  I will check on Mr. Sebacious's schedule.  This
18           agreement shall become effective upon my receipt of
              confirmation that you agree to it.

19     (Emphasis added.)

20         59.    <u>Mr. Krasik did not disagree with my characterization of the reasons for</u>

21   <u>deferring the depositions</u>.

22   **E.**    **Defendants' Cosmetic Document Production and Defendants' Refusal to**
23        **Meet and Confer**

24         60.    Late in the afternoon on Wednesday, February 11, 2015, defendants

25   purported to produce 345 pages of documents in response to plaintiff's requests for

26   production.  ***The production consists almost entirely of documents that <u>plaintiff</u>***

27   ***<u>had produced to defendants</u> in proceedings before the Trademark Trial and***

28   ***Appeals Board or defendants filed publically with the Patent and Trademark***

1   *Office*.

2   61.     The sole "new" document defendants produced that will is relevant to

3   defendants' motion for summary judgment is a 2009 email from Cafiero to Hot

4   Topic, in which Cafiero again falsely stated that defendants owned the exclusive

5   rights to the Misfits Skull.  I believe defendants produced that document only

6   because I had told Mr. Krasik a day or two before that plaintiff already had it.

7   62.     Attached hereto as **Exhibit 23** is a true and correct copy of a

8   February 13, 2015 email I sent to Mr. Krasik to initiate the meet and confer process

9   concerning defendants' failure to produce documents they have agreed to produce in

10   their responses to plaintiff's requests for production, concerning defendants'

11   unmeritorious objections to requests as to which they have failed to produce

12   documents, and defendants' failure to provide a privilege log.

13   63.     Exhibit 23 includes Mr. Krasik's February 15, 2015 response to my

14   February 13, 2015 effort to meet and confer.  Mr. Krasik is unwilling to meet and

15   confer even as to documents defendants have failed and refused to produce that are

16   relevant to their impending motion for summary judgment until and unless plaintiff

17   produces all of the documents that defendants have requested.

18   64.     Exhibit 23 also includes my February 17, 2015 response to Mr. Krasik,

19   in which I advised him as follows:

20   The pressing need is for documents relevant to defendants'
    motion for summary judgment, including documents

21   responsive to request numbers 4, 5, 13, 14, 16, 18, 19, 22,
    24 and 26.  ***Defendants, not plaintiff, has those***.  Will you

22   produce them before filing your motion for summary
    judgment?

23

24   65.     I have not received a substantive response to my February 17, 2015

25   email from Mr. Krasik.

26   **F.     Defendants' Motion for Summary Judgment**

27   66.     Attached hereto as **Exhibit 24** is a true and correct copy of a

28   February 13, 2015 email I received from Mr. Krasik in which he advised me that

1   defendants intend to move for summary judgment on the ground that "plaintiff has

2   no admissible evidence in support of any of the elements of the claim for

3   interference with prospective business advantage pled in the First Amended

4   Complaint."  The evidence to which Mr. Krasik refers is in the possession of

5   defendants in the form of documents and information.  Defendants continue to

6   refuse to produce the relevant documents and testimony.  (See Ex. 23 February 13-

7   17, 2015 email chain between Mr. Krasik and me.)

8         I declare under penalty of perjury under the laws of the United States that the

9   foregoing is true and correct.

10         Executed on February 17, 2015 at Los Angeles, California..

11

12         /s/_____

13         Stephen D. Rothschild

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2015, I electronically filed the foregoing **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF STEPHEN D. ROTHSCHILD IN OPPOSITION TO DEFENDANTS' EX PARTE APPLICATION FOR SANCTIONS** with the Clerk of the Court by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dina Webb

KING, HOLMES,
PATERNO &
BERLINER, LLP

3421.065/857116.2