**EXHIBIT 11**

# Yvette Toko

| | |
|---|---|
| **From:** | Steve Rothschild |
| **Sent:** | Tuesday, February 10, 2015 2:40 PM |
| **To:** | Yvette Toko |
| **Subject:** | FW: Settlement Offer |
| **Attachments:** | PI-3765269-v2.docx; Redline - PI-3765269-v1 and PI-3765269-v2.docx |

Stephen D. Rothschild
King, Holmes, Paterno & Berliner LLP
1900 Avenue of the Stars, 25th Floor
Los Angeles, CA 90067
Telephone:  310-282-8986
Facsimile:   310-282-8903
Email:       rothschild@khpblaw.com

From: Krasik, Curtis B. [mailto:Curtis.Krasik@klgates.com]
Sent: Tuesday, February 10, 2015 10:43 AM
To: Steve Rothschild
Cc: Krasik, Curtis B.
Subject: Settlement Offer

Steve,

Attached are clean and redline versions of settlement terms to which my clients would agree.  Please let me know if you would like to discuss anything further.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Curtis.Krasik@klgates.com.-4

1

## Memorandum of Understanding on Material Settlement Terms

Plaintiff Glenn Danzig, on the one hand, and Defendants Cyclopian Music, Inc. and Gerard Caiafa (collectively, "Cyclopian"), on the other hand, agree as follows:

WHEREAS, Danzig commenced the lawsuit captioned *Glenn Danzig v. Gerald Caiafa and Cyclopian Music, Inc.*, Case No. 14-CV-02540 RGK (the "Lawsuit");

WHEREAS, Cyclopian asserted a counterclaim against Danzig in the Lawsuit;

WHEREAS, Danzig filed certain trademark cancellation and opposition proceedings against Cyclopian that are pending in the TTAB (the "TTAB proceedings");

WHEREAS, due to the costs and uncertainties of litigation, Danzig and Cyclopian have agreed to settle all disputes between them on the material terms set forth in this memorandum of understanding (the "MOU")

NOW, THEREFORE, the parties hereto, intending to be legally bound, agree as follows:

1. The parties agree that this MOU is a binding and enforceable contract. Despite the binding nature of this MOU, the parties acknowledge that it will be to their mutual benefit to further define their respective rights and responsibilities in a more detailed settlement agreement and agree to use their best efforts to do so, but that such settlement agreement shall be in all respects consistent with the terms of this MOU.  The settlement agreement will supercede this MOU.  The parties agree to submit to final and binding arbitration under the Commercial Rules of Arbitration of the American Arbitration Association, by one or more arbitrators appointed in accordance with those Rules, any disputes arising out of the MOU or the settlement agreement, including without limitation, the terms of the settlement agreement.


~~1~~2.   Reunion

a.   The parties agree to perform at least six ~~Original~~ Misfits reunion shows ~~to coincide, to the extent~~as soon as practicable~~, with the 40th anniversary of the band~~.  The parties shall split all Misfits proceeds (including merch for the tour as well as any reunion-specific merch to be sold at retail) from any such reunion endeavors 50/50 after deduction of expenses.  ~~The billing shall be of the "Original Misfits."~~

b.   The parties agree to share all expenses related to reunion endeavors 50/50 unless otherwise mutually agreed in writing (e.g., in the event a third party will pay); however, the parties shall agree on a base amount of per-party travel and other tour-related personal expenses, which each party may supplement from his or its owns funds or, in the alternative, the parties may agree that each shall be responsible for his/its own tour-related travel and personal expenses.  Any other performers will be paid as employees.

February 9, 2015

~~2~~3.    50/50 ownership through a jointly held entity of <u>the</u> Misfits ~~designs and trademarks~~<u>word mark, the Misfits horror font logo, and the Fiend Skull in connection with consumer merchandise as well as any existing or future trademark registrations relating thereto in Classes 14, 16 (as it relates to commercial merchandise), 25, and 28</u>, including, but not limited to, the following:

a.    Mark numbers

i.    Registered Mark No. 2793533 (~~drawing with Misfits aka Fiend Skulls ("Skull"),~~<u>word mark,</u> Class 014),

~~ii.    Registered Mark No. 2735848 (horror font, Classes 09, 016)~~

~~iii.    Registered Mark No. 2634215 (word mark, Classes 09, 016, 041)~~

~~iv~~<u>ii</u>.    Registered Mark No. 2770984 (Skull, Classes 014, 016, 025<u>, 028</u>)

~~v~~<u>iii</u>.    ~~Applied for Mark~~<u>Application</u> No. 76605515 (word mark, Class 025)

~~vi~~<u>iv</u>.    ~~Applied for Mark~~<u>Application</u> No. 76605840 (horror font, Class 025)

("Misfits designs" as used herein ~~include~~<u>shall mean</u> the above-listed marks and ~~the Skull and~~ designs incorporating ~~the Skull, the word Misfits, and the horror font~~<u>those marks</u>.)

b.    The above-listed registrations and applications shall be assigned to the jointly owned entity.

c.    Danzig may not use Misfits designs in any manner inconsistent with paragraph 7 of the 1995 Settlement Agreement regarding rights to perform <u>or record</u> as the Misfits, except with respect to the reunion ~~and related material.  This shall not prevent Danzig from advertising that he will be performing songs from the Misfits era at Danzig or other shows and performances~~<u>between the parties as provided herein</u>.

d.    Cyclopian/Caiafa shall continue to have the exclusive right to publicly perform and record as the Misfits pursuant to paragraph 7 the parties' 1995 Settlement Agreement ~~and to use the Marks in connection with same~~.

~~3~~<u>4</u>.    The parties agree <u>to use best efforts</u> not to disparage each other ~~publically~~<u>publicly.</u>

~~4~~<u>5</u>.    Merchandise

a.    Cyclopian shall enter into a commercially reasonable non-exclusive agreement with Live Nation terminable no earlier than the termination of Danzig's existing agreement with Live Nation.  ("The Term" as used hereinafter means the period from when Cyclopian enters into such agreement to the termination of Danzig's existing agreement with Live Nation.)

b.  Cyclopian warrants that it is under no contractual obligation or other impediment that prevents it from approving new Live Nation Misfits designs.

c.  ~~The parties shall split 50/50 all revenues derived from Misfits designs under their respective agreements with~~ Live Nation during the Term, ~~except as otherwise specifically stated herein.~~ Danzig represents that he has granted an exclusive license to Live Nation with respect to his rights in Misfits intellectual property for apparel.  With the exception of rights previously granted to ▓▓▓▓▓ for a limited production of approximately 225 skateboards, Danzig shall grant an exclusive license to Live Nation with respect to his rights in Misfits intellectual property for all categories of commercial merchandise.

d.  Neither party may unreasonably withhold from Live Nation approval of merchandise bearing Misfits designs that existed before 1995 or the Fiend Skull during the Term~~, except that Cyclopian shall be under no obligation to approve designs described in paragraph 4(h), below~~.

e.  The parties shall split all profits 50/50 from sales of Misfits designs that existed before 1995 ~~or that are reunion designs,~~ sold through Live Nation or ~~any other person or entity~~ that are reunion designs.

f.  The parties shall split all profits 50/50 from sales of merchandise bearing the Fiend Skull or derivatives sold through Live Nation during the Term; provided, however Cyclopian shall retain 100% of revenues from merchandise bearing Fiend Skull derivatives relating to activities of the band post-1995 not involving Danzig.  Upon the expiration of the Term, in the event Danzig enters into a new license with Live Nation or any other merchandiser(s), the terms of this paragraph shall continue to apply provided Cyclopian agrees to grant such other merchandiser(s) a nonexclusive license.  Danzig shall provide Cyclopian with reasonable advance notice if he intends to enter into a license with another merchandiser(s).

~~f~~g.  The parties each shall retain 100% of revenues from their own post-1995 Misfits designs ~~existing as of the execution of this MOU,~~ sold through Live Nation or any other person or entity.

~~g~~h.  Cyclopian shall retain ~~all~~ 100% of revenues from non-Live Nation sales of and licenses for products bearing Misfits designs ~~during the Term, except as stated elsewhere, including in paragraphs 1 and 4(e) with respect to reunion and pre-1995 products and designs~~.

i.  Danzig shall retain 100% of revenues from sales of the limited production skate boards referenced in Paragraph 3.

h.  ~~Cyclopian shall retain 100% of revenues from designs that prominently feature images of the new Misfits, the names of New Misfits songs or album titles, or other readily apparent references to the new Misfits, whether sold or licensed through Live Nation or otherwise.~~

i.  ~~Danzig shall retain 100% of revenues from all non-apparel products or licenses for such products bearing Misfits designs that are not sold or licensed through Live Nation (except as otherwise stated in paragraphs 1 (reunion merchandise) and 4(e) (pre-1995 designs).  Non-apparel sold or licensed through Live Nation shall be subject to a 50/50 split.~~

February 9, 2015

~~j.   After the Term, each party retains 100% of revenues from his/its sales/licenses of Misfits products/designs, through Live Nation or otherwise, except as per 1(a) and 4(e) above, and unless they agree otherwise in writing.~~

~~5.   In the event that Cyclopian does not reach an agreement with Live Nation, each party shall retain all revenues from their own sales of and licenses to sell products bearing Misfits designs, except as otherwise stated in paragraph 1(a) and 4(e) above regarding revenues from pre-1995 and reunion designs, which the parties shall split 50/50.~~

6.   Danzig shall grant Cyclopian or its ~~affiliate~~affiliates sync and/or mechanical licenses on commercially reasonable terms to ~~his~~'77-'83 era Misfits ~~songs~~compositions.  Cyclopian or its ~~affiliate~~affiliates shall not materially change the ~~songs~~compositions.

7.   Danzig shall not depict any Misfits intellectual property in association with any Samhain or Danzig intellectual property.

~~8.   The parties shall negotiate a long form agreement in good faith which will supersede the MOU.~~

~~9~~8.   Live Nation ~~and Danzig~~or any successor-licensee to which Cyclopian grants a non-exclusive license shall be authorized to sell merch depicting the Fiend Skull to Hot Topic ~~notwithstanding~~under Cyclopian's settlement agreement with Hot Topic dated as of April 18, 2003~~, and Hot Topic shall no longer be bound by the 2003 agreement with respect to Danzig and his merchandisers and/or licensees~~.

~~10.   Any future disputes between or among the parties arising from or under the MOU or long form agreement, including, but not limited to, any dispute as to the long form agreement's terms, shall be submitted to binding arbitration before and under the rules of ADR Services or such other arbitration service as the parties may agree in Los Angeles County, California; arbitration agreement to be self- executing; prevailing party to recover reasonable attorney fees, arbitrator's fees, and other costs.~~

9.   Danzig and Cyclopian shall mutually release the other of all claims arising from facts or circumstances existing as of the date of settlement, including, without limitation, all claims actually asserted or which could have been asserted in the Lawsuit or the TTAB proceedings.

10.   Within twenty-four (24) hours of execution of this MOU by both parties, the parties shall file a notice of dismissal with prejudice of the Lawsuit, with each party to bear his or its own attorneys' fees and costs.  Danzig shall dismiss with prejudice the TTAB proceedings, with each party to bear his or its own attorneys' fees and costs.

4

February 9, 2015

=

11. The terms of this MOU shall be kept strictly confidential.

12. This MOU may be executed in counterparts and by facsimile or PDF signature.

AGREED and ACCEPTED:

_____        Dated: _____

Glenn Danzig

_____        Dated: _____

Gerard Caiafa

_____        Dated: _____

Cyclopian Music, Inc.

February 9, 2015

| Summary report: Litéra® Change-Pro TDC 7.5.0.135 Document comparison done on 2/10/2015 1:38:33 PM ||
|---|---|
| **Style name:** KL Standard ||
| **Intelligent Table Comparison:** Active ||
| **Original DMS:** dm://PI/3765269/1 ||
| **Modified DMS:** dm://PI/3765269/2 ||
| **Changes:** ||
| Add | 59 |
| Delete | 48 |
| Move From | 1 |
| Move To | 1 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 109 |

## Memorandum of Understanding on Material Settlement Terms

Plaintiff Glenn Danzig, on the one hand, and Defendants Cyclopian Music, Inc. and Gerard Caiafa (collectively, "Cyclopian"), on the other hand, agree as follows:

WHEREAS, Danzig commenced the lawsuit captioned *Glenn Danzig v. Gerald Caiafa and Cyclopian Music, Inc.*, Case No. 14-CV-02540 RGK (the "Lawsuit");

WHEREAS, Cyclopian asserted a counterclaim against Danzig in the Lawsuit;

WHEREAS, Danzig filed certain trademark cancellation and opposition proceedings against Cyclopian that are pending in the TTAB (the "TTAB proceedings");

WHEREAS, due to the costs and uncertainties of litigation, Danzig and Cyclopian have agreed to settle all disputes between them on the material terms set forth in this memorandum of understanding (the "MOU")

NOW, THEREFORE, the parties hereto, intending to be legally bound, agree as follows:

1. The parties agree that this MOU is a binding and enforceable contract. Despite the binding nature of this MOU, the parties acknowledge that it will be to their mutual benefit to further define their respective rights and responsibilities in a more detailed settlement agreement and agree to use their best efforts to do so, but that such settlement agreement shall be in all respects consistent with the terms of this MOU. The settlement agreement will supercede this MOU. The parties agree to submit to final and binding arbitration under the Commercial Rules of Arbitration of the American Arbitration Association, by one or more arbitrators appointed in accordance with those Rules, any disputes arising out of the MOU or the settlement agreement, including without limitation, the terms of the settlement agreement.

2. Reunion

a. The parties agree to perform at least six Misfits reunion shows as soon as practicable. The parties shall split all Misfits proceeds (including merch for the tour as well as any reunion-specific merch to be sold at retail) from any such reunion endeavors 50/50 after deduction of expenses.

b. The parties agree to share all expenses related to reunion endeavors 50/50 unless otherwise mutually agreed in writing (e.g., in the event a third party will pay); however, the parties shall agree on a base amount of per-party travel and other tour-related personal expenses, which each party may supplement from his or its owns funds or, in the alternative, the parties may agree that each shall be responsible for his/its own tour-related travel and personal expenses. Any other performers will be paid as employees.

1

February 9, 2015

3.      50/50 ownership through a jointly held entity of the Misfits word mark, the Misfits horror font logo, and the Fiend Skull in connection with consumer merchandise as well as any existing or future trademark registrations relating thereto in Classes 14, 16 (as it relates to commercial merchandise), 25, and 28, including, but not limited to, the following:

a.      Mark numbers

i.      Registered Mark No. 2793533 (word mark, Class 014),

ii.     Registered Mark No. 2770984 (Skull, Classes 014, 016, 025, 028)

iii.    Application No. 76605515 (word mark, Class 025)

iv.     Application No. 76605840 (horror font, Class 025)

("Misfits designs" as used herein shall mean the above-listed marks and designs incorporating those marks.)

b.      The above-listed registrations and applications shall be assigned to the jointly owned entity.

c.      Danzig may not use Misfits designs in any manner inconsistent with paragraph 7 of the 1995 Settlement Agreement regarding rights to perform or record as the Misfits, except with respect to the reunion between the parties as provided herein.

d.       Cyclopian/Caiafa shall continue to have the exclusive right to publicly perform and record as the Misfits pursuant to paragraph 7 the parties' 1995 Settlement Agreement.

4.      The parties agree to use best efforts not to disparage each other publicly.

5.      Merchandise

a.      Cyclopian shall enter into a commercially reasonable non-exclusive agreement with Live Nation terminable no earlier than the termination of Danzig's existing agreement with Live Nation. ("The Term" as used hereinafter means the period from when Cyclopian enters into such agreement to the termination of Danzig's existing agreement with Live Nation.)

b.      Cyclopian warrants that it is under no contractual obligation or other impediment that prevents it from approving new Live Nation Misfits designs.

c.      Danzig represents that he has granted an exclusive license to Live Nation with respect to his rights in Misfits intellectual property for apparel. With the exception of rights previously granted to ▓▓▓▓▓▓ for a limited production of approximately 225 skateboards, Danzig shall

grant an exclusive license to Live Nation with respect to his rights in Misfits intellectual property for all categories of commercial merchandise.

d.  Neither party may unreasonably withhold from Live Nation approval of merchandise bearing Misfits designs that existed before 1995 or the Fiend Skull during the Term.

e.  The parties shall split all profits 50/50 from sales of Misfits designs that existed before 1995 sold through Live Nation or that are reunion designs.

f.  The parties shall split all profits 50/50 from sales of merchandise bearing the Fiend Skull or derivatives sold through Live Nation during the Term; provided, however Cyclopian shall retain 100% of revenues from merchandise bearing Fiend Skull derivatives relating to activities of the band post-1995 not involving Danzig. Upon the expiration of the Term, in the event Danzig enters into a new license with Live Nation or any other merchandiser(s), the terms of this paragraph shall continue to apply provided Cyclopian agrees to grant such other merchandiser(s) a nonexclusive license. Danzig shall provide Cyclopian with reasonable advance notice if he intends to enter into a license with another merchandiser(s).

g.  The parties each shall retain 100% of revenues from their own post-1995 Misfits designs sold through Live Nation or any other person or entity.

h.  Cyclopian shall retain 100% of revenues from non-Live Nation sales of and licenses for products bearing Misfits designs.

i.  Danzig shall retain 100% of revenues from sales of the limited production skate boards referenced in Paragraph 3.

6.  Danzig shall grant Cyclopian or its affiliates sync and/or mechanical licenses on commercially reasonable terms to '77-'83 era Misfits compositions. Cyclopian or its affiliates shall not materially change the compositions.

7.  Danzig shall not depict any Misfits intellectual property in association with any Samhain or Danzig intellectual property.

8.  Live Nation or any successor-licensee to which Cyclopian grants a non-exclusive license shall be authorized to sell merch depicting the Fiend Skull to Hot Topic under Cyclopian's settlement agreement with Hot Topic dated as of April 18, 2003.

February 9, 2015

9. Danzig and Cyclopian shall mutually release the other of all claims arising from facts or circumstances existing as of the date of settlement, including, without limitation, all claims actually asserted or which could have been asserted in the Lawsuit or the TTAB proceedings.

10. Within twenty-four (24) hours of execution of this MOU by both parties, the parties shall file a notice of dismissal with prejudice of the Lawsuit, with each party to bear his or its own attorneys' fees and costs. Danzig shall dismiss with prejudice the TTAB proceedings, with each party to bear his or its own attorneys' fees and costs.

11. The terms of this MOU shall be kept strictly confidential.

12. This MOU may be executed in counterparts and by facsimile or PDF signature.

AGREED and ACCEPTED:


_____  Dated: _____
Glenn Danzig


_____  Dated: _____
Gerard Caiafa


_____  Dated: _____
Cyclopian Music, Inc.

February 9, 2015